# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

CONSTANCE R. NUSSER,

      Plaintiff,

v.

JOHN E. POTTER, Postmaster
General of the United States,

      Defendant.

_____/

CASE NO. 06-12235
HON. LAWRENCE P. ZATKOFF

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on July 19, 2007

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court upon Defendant's Motion for Summary Judgment. *See* Docket #18. Plaintiff responded to this motion on June 6, 2007, and Defendant has since replied. The Court finds that the facts and legal arguments are adequately presented in the parties' papers and the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. MICH. LR 7.1(e)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted. For the reasons set forth below, Defendant's Motion for Summary Judgment will be GRANTED.

## II. BACKGROUND

This case arises from alleged employment discrimination and retaliation based on Plaintiff's disability. Plaintiff was hired by the United States Postal Service in 1989, and began working as a

regular letter carrier at the Riverview, Michigan, Post Office in 1993. In March 1999, Plaintiff was injured on her route while pushing a mail cart. Plaintiff underwent surgery in July of that year in which three herniated discs were fused, two vertebrae were repaired, and a metal plate was inserted in her cervical spine. Following surgery, Plaintiff made a claim with the Office of Workman's Compensation Programs (OWCP), which was accepted. After a failed attempt to return to her normal duties, Plaintiff accepted Defendant's offer of a modified letter carrier position, which accommodated her physical restrictions. At the time she accepted the offer, Plaintiff's restrictions included a 15 pound lifting restriction, a restriction from bending and stooping for more than 15 minutes per day, a one-hour per day driving restriction in her personal vehicle, a complete restriction from twisting, and a complete restriction from driving Defendant's mail delivery vehicles.

In 2003, Plaintiff was suspended and discharged for allegedly falsifying a claim for worker's compensation benefits. Plaintiff filed the instant action on May 16, 2006, claiming that Defendant discriminated against her based on her disability when it suspended and discharged her in 2003. Further, Plaintiff argues that Defendant retaliated against her for complaining about discrimination in the workplace. Finally, Plaintiff alleges that she experienced an actionable hostile work environment at the Riverview Post Office. Defendant now moves for summary judgment as to all of Plaintiff's claims.

### III.  LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PRO. 56(c); *accord Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005). "Where the

defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249 (citations omitted).

## IV. DISCUSSION

### A. Plaintiff's Disability Discrimination Claim

#### 1. Factual Background for Plaintiff's Disability Discrimination Claim

In September 2002, Michael Taurence became the Postmaster for Wyandotte, which included the Riverview Post Office. (*See* Def.'s Ex. 8 ¶ 2, 4). Prior to Taurence's appointment as Postmaster, the Untied States Postal Service implemented a National Resource Initiative (NRI) to address issues pertaining to limited duty employees. (*See* Def.'s Ex. 35). Limited duty employees are those employees who have been injured on the job and are no longer able, with all reasonable accommodations, to perform all of the essential duties of their positions. (*See* Pl.'s Dep. at 19). Federal law requires the Postal Service to provide work for such employees or pay them worker's compensation benefits. (*See* Def.'s Ex. 34 ¶ 4).

As part of the NRI, Plaintiff's doctor evaluated her condition in October 2002. (*See* Def.'s Ex. 13). On a form provided by Defendant, Plaintiff's doctor indicated that Plaintiff's limitations included bending and stooping for no more than 15 minutes per day, lifting no more than 15 pounds, and driving a personal vehicle one hour per day. (*See* Def.'s Ex. 6). Further, Plaintiff's doctor indicated that these restrictions were permanent and were in addition to the limitations Plaintiff had been under since her injury in 1999, which included no twisting. (*See* Mahmood Dep. at 11-12). Plaintiff submitted this form to Defendant for purposes of retaining her modified work assignment and worker's compensation benefits. (*See* Pl.'s Dep. at 30). Notwithstanding her restrictions, Plaintiff began participating in a bowling league in September 2002. (*See id.* at 103).

In early 2003, Taurence learned that Plaintiff was involved in a bowling league, which several union members felt was inconsistent with her work restrictions. (*See* Taurence Dep. at 9-17). Accordingly, Taurence notified the Postal Inspection Service on February 12, 2003, of Plaintiff's activity and requested an investigation into possible fraud. (*See* Def.'s Ex. 10). Thereafter, the Postal Inspection Service conducted surveillance on Plaintiff at a bowling alley and observed her bowling, bending, twisting, stooping and lifting a bowling ball repeatedly with no apparent pain or discomfort. (*See id.*). A video was made of Plaintiff's activity. (*See* Def.'s Ex. 11).

On February 21, 2003, Plaintiff and three other limited duty postal employees sent Taurence a letter expressing their belief that they were being harassed at work and requesting a meeting with him. (*See* Pl.'s Ex. D). Because one of these employees had a history of bringing frivolous grievances, Taurence requested the assistance of Defendant's law department in responding to the letter. (*See* Taurence Dep. at 12, 21). Based on the advice of the legal department, Taurence refused to meet with the employees without union representation as required by the collective bargaining

agreements with the workers' unions. (*See* Def.'s Ex. 26). Nevertheless, the four employees sent another letter requesting a meeting on March 1, 2003, and stating that they did not want union representation in the matter. (*See* Def.'s Ex. 28). Taurence responded on March 3, relying on his statements in his previous response, and stated that he had ordered an independent assessment team to evaluate the workers' claims of harassment. (*See* Def.'s Ex. 29).

In connection with Taurence's order for an independent assessment of the work environment, a work place analyst conducted interviews at the Wyandotte, Riverview and Southgate Post Offices on March 13, 14, and 18, 2003, respectively. (*See* Pl.'s Ex. E). As part of the interview, every third employee was asked the following questions: (1) whether there was a hostile work environment towards disabled employees? and (2) whether disabled employees were discriminated against, retaliated, or harassed? (*See id.*). The work place analyst recorded the responses and prepared a report summarizing the responses on March 31, 2003. (*See id.*). Defendant's human resources manager reviewed this report, at Taurence's request, and concluded that the responses did not evidence a discriminatory atmosphere towards disabled employees. (*See* Def.'s Ex. 32).

On May 28, 2003, the Postal Inspector who had been investigating Plaintiff interviewed Plaintiff's doctor and showed him the surveillance video of her bowling. (*See* Def.'s Ex. 10). Plaintiff's doctor stated that bowling was a very unwise activity for anyone, especially for someone with Plaintiff's injuries. (*See id.*). Moreover, the doctor stated that Plaintiff did not tell him that she participated in a bowling league and he was otherwise unaware of her activity. (*See id.*). After reviewing Plaintiff's restrictions and viewing the surveillance video, the doctor stated that in his medical opinion Plaintiff no longer needed restrictions on bending, stooping or twisting and could resume lifting up to 25 pounds. (*See* Def.'s Ex. 12).

The Postal Inspector interviewed Plaintiff on May 30, 2003. (*See* Def.'s Ex. 14). During the interview, Plaintiff recalled her medical restrictions and their origin. (*See id.*). The Postal Inspector then asked Plaintiff about her current medical condition, specifically about her outside activities. Plaintiff stated that she had been bowling since September 2002. (*See id.*). Plaintiff also stated that she informed her doctor of her activity and that he approved of it. (*See id.*). When informed of the interview with her doctor, Plaintiff stated that she was shocked that the doctor did not approve of her bowling. (*See id.*). Later that day, Plaintiff was placed on emergency off-duty status based on Defendant's belief that she falsified her OWCP claim submitted in October 2002 by not informing her doctor of her physical abilities. (*See* Def.'s Ex. 15).

On July 7, 2003, Defendant issued Plaintiff a notice of removal charging her with unacceptable conduct in violation of Defendant's Employee and Labor Relations Manual. (*See* Def.'s Ex. 17 at 4). Specifically, Defendant accused Plaintiff of violating Detroit District General Order #1–Dischargable Infractions, Item 4, which defines the dischargable offense of falsification as "[p]resentation of false documentation, [f]ailure to provide information that would directly affect conditions of employment, entering false information on official documents/records, etc."(*Id.*). Plaintiff's termination took effect on August 8, 2003. (*See* Def.'s Ex. 17).

Plaintiff's union subsequently filed a grievance challenging her emergency suspension and removal, arguing that bowling did not violate her 15 pound lifting restriction because her bowling ball only weighed 10 pounds. The union also argued that the total time Plaintiff spent bending and stooping during her bowling nights was less than 15 minutes. Despite having her grievance denied at the first and second levels, an arbitrator issued an award in Plaintiff's favor, concluding that since no medical evidence showed that bowling violated her work restrictions there was insufficient

evidence that Plaintiff deliberately misled her doctor. (*See* Pl.'s Ex. G). Plaintiff returned to work on July 19, 2004, and following a functional capacity examination in December 2005, is currently working under more strict limitations than before her dismissal.

### 2. Analysis of Plaintiff's Disability Discrimination Claim

The Rehabilitation Act of 1973 (the Act), 29 U.S.C. §§ 701 *et seq*., prohibits federal agencies, federal contractors, and recipients of federal funds from discrimination and retaliation in employment against disabled persons. 29 U.S.C. § 791; *Hiler v. Brown*, 177 F.3d 542, 545 (6th Cir 1999). The Act entitles aggrieved federal employees to the same "remedies, procedures, and rights" set forth in Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. *Hiler*, 177 F.3d at 545. In the absence of direct evidence of discrimination, Title VII claims, and consequently claims brought under the Rehabilitation Act, are analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under *McDonnell Douglas*, the plaintiff has the initial burden to establish a prima facie case. *Id.* Once a prima facie case has been shown, "the plaintiff is entitled to a presumption that the defendant discriminated against him or her in violation of title VII." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). The burden of production then shifts to the defendant to assert a legitimate nondiscriminatory reason for the complained adverse treatment. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). The defendant need only produce a legitimate, nondiscriminatory reason; it need not persuade the court that this reason actually motivated the employment actions in question. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000). If the defendant meets this burden, "the presumption of discrimination created by the prima facie case falls away and the plaintiff then needs to show that the defendant's legitimate

nondiscriminatory reason was a pretext for discrimination." *Wright*, 455 F.3d at 706-707 (internal citations and quotations omitted). The burden of persuading the trier of fact that the defendant's asserted justification is pretextual ultimately rests with the plaintiff. *See Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003).

   *i. Plaintiff's Prima Facie Case*

In order to establish a prima facie case of disability discrimination, Plaintiff must show that (1) she is disabled, (2) she is otherwise qualified for the job, with or without accommodation, (3) she suffered an adverse employment action, (4) her employer knew or had reason to know of her disability, and (5) following the adverse employment action, either she was replaced by a non-disabled person or her position remained open. *See Timm v. Wright State Univ.*, 375 F.3d 418, 423 (6th Cir. 2004); *DiCarlo v. Potter*, 358 F.3d 408, 418 (6th Cir. 2004); *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir. 1996). "The final element 'may also be satisfied by showing that similarly situated non-protected employees were treated more favorably.'" *Jones v. Potter*, 2007 WL 1753564 (6th Cir. June 20, 2007) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995)).

Initially, Defendant argues that since Plaintiff was suspended and terminated based on her alleged misconduct, she cannot show that the adverse employment action occurred solely because of her disability. However, this argument confuses Plaintiff's prima facie burden with her ultimate burden of persuasion. The Sixth Circuit recently rejected Defendant's argument in *Jones v. Potter*, *supra*, stating that "[a]n inference that the adverse action occurred 'solely by reason of' the plaintiff's disability, in short, is *the result* of the prima facie test, not an element of it." *Id.* (emphasis in original); *Macy v. Hopkins County Sch. Bd. of Ed.*, 484 F.3d 357, 364 (6th Cir. 2007) (stating the

court "must examine plaintiff's evidence [at the prima facie stage of a termination case] independent of the nondiscriminatory reason 'produced' by the defense as a its reason for terminating plaintiff"). Consequently, the Court rejects Defendant's argument that its proffered reason for discharging Plaintiff prevents her from demonstrating her prima facie case.

Notwithstanding the foregoing conclusion, the Court finds that Plaintiff's claim is defective for a more fundamental reason: she has presented no evidence from which a reasonable jury could infer that she was discriminated against because of her disability. That is, Plaintiff has not met the final element of her prima facie case. The burden of presenting a prima facie case of disparate treatment is not a difficult one, *see Macy*, 484 F.3d at 364, yet Plaintiff must still present sufficient evidence to raise a genuine issue of material fact as to each element of her prima facie case, *Id.* at 364 n.4 (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)). "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.* at 365.

There is no dispute that Plaintiff was a qualified individual with a disability, that Defendant was aware of the disability, and that Plaintiff suffered an adverse employment action. There is nothing in the record, however, showing that Plaintiff was replaced by a non-disabled person, *see Wright*, 455 F.3d at 707, that her position remained open, *see Monette*, 90 F.3d at 1185, or that a similarly situated non-disabled person received more favorable treatment, *see Wright*, 455 F.3d at 707. The record in this case shows that Plaintiff accepted a modified job assignment in order to accommodate her medical restrictions in 2000. Upon returning to work Defendant never required her to perform tasks that exceeded those restriction, *see* Pl.'s Dep. at 31-32, and when co-workers

failed to accommodate Plaintiff's restrictions, Plaintiff promptly resolved the problem by bringing it to the co-worker's attention. In addition, Plaintiff cannot rely on an incident involving an ergonomic chair as evidence of discrimination based on a disability because Defendant did not prevent Plaintiff from using the chair in favor of a non-disabled worker: it is undisputed that another employee with a back problem was using the chair. Lastly, Plaintiff worked for over two years in a modified job assignment before she was discharged. Consequently, this is not a case where the employer took adverse action against the employee shortly after learning of the employee's disability.

Moreover, Plaintiff has not shown that she was replaced by a non-disabled worker or that her position remained open after her termination. The evidence of record shows that Plaintiff's position was *created* to accommodate her medical restrictions by gathering various tasks that would have otherwise been done by other employees. *See* Def.'s Ex. 7. Thus, once Plaintiff was discharged, her duties were again distributed to the other employees in the office. "Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1115 (6th Cir. 2001) (quoting *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992)).

Finally, Plaintiff has presented no evidence that a similarly situated non-disabled employee was treated more favorably that she was under the circumstances. In order to make this showing, Plaintiff had to present evidence that she was similarly situated to the non-disabled employee in all relevant aspects. *See Ecergovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). In this case, Plaintiff was accused of misrepresenting her medical condition to her doctor and to Defendant. Plaintiff has presented no evidence that a non-disabled employee, subject to the same

standards of conduct, and accused of falsification was not suspended or discharged. Accordingly, there is no evidence of disparate treatment because of Plaintiff's disability.

Although Plaintiff states that the basis for her discharge (misrepresenting her medical condition) is inextricably intertwined with her disability and, thus, occurred because of her disability, the Sixth Circuit has made clear that "an employer may fire a person for his conduct even if that conduct is related to the employee's disability." *Maddox v. Univ. of Tennessee*, 62 F.3d 843, 848 (6th Cir. 1995); *accord Brohm v. JH Properties, Inc.*, 149 F.3d 517, 521 (6th Cir. 1998). Merely because Plaintiff's alleged misrepresentation involved the extent of her disability does not alter the fact it was a misrepresentation that violated a work rule. As such, the fact that the misrepresentation involved Plaintiffs disability, on its own, does not give rise to an inference of illegal discrimination. Thus, Plaintiff has not shown she was suspended or terminated under circumstances giving rise to an inference of impermissible discrimination based on her disability. Rather, a jury would be left to speculate as to the reasons for Plaintiff's discharge.

*ii. Pretext*

Even if Plaintiff could make a prima facie showing of illegal discrimination based on her disability, Defendant has the opportunity to articulate a legitimate nondiscriminatory reason for its actions. In this case, Defendant contends that Plaintiff was fired not because of her disability but because she misled Defendant as to the extent of her disability by failing to provide information to her doctor that would have affected the conditions of her employment. Specifically, while Plaintiff was restricted from lifting more than 15 pounds, from bending and stooping for more than 15 minutes per day, and from twisting, she also participated in a bowling league that required Plaintiff to perform many of the movements she was restricted from doing. Defendant claims that by not

telling her doctor that she participated in bowling league, Plaintiff violated Detroit District General Order #1–Dischargable Infractions, Item 4, which defines the dischargable offense of falsification as "[p]resentation of false documentation, [f]ailure to provide information that would directly affect conditions of employment, entering false information on official documents/records, etc." Def.'s Ex. 17 at 4. The Court finds that this is a legitimate non-discriminatory reason for Plaintiff's discharge. Plaintiff must now come forward with sufficient evidence from which a reasonable jury could conclude that Defendant's asserted reason was a pretext for discrimination.

A plaintiff may demonstrate pretext by demonstrating "by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [her] discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (internal quotations omitted). "The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's [disparate treatment] never happened, i.e., that they are 'factually false.'" *Id.* at 1084 (quoting *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123-24 (7th Cir. 1994)). The third showing is just as recognizable and "consists of evidence that other employees, particularly employees not in the protected class were not [treated similar to the plaintiff] even though they engaged in substantially identical conduct to that which the employer contends motivated its [adverse action against] the plaintiff." *Id.* at 1084. The second type of showing, however, is different, requiring the plaintiff to admit the factual basis of the employer's proffered explanation and that it was sufficient to motivate the action against her, and to show that "the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." *Id.* at 1084. "In order to make [the second] type

of rebuttal showing, the plaintiff may not rely simply upon [her] prima facie case but must, instead, introduce additional evidence of [disability] discrimination." *Id.* at 1084.

Plaintiff has not presented any evidence bearing on the second and third methods of showing pretext. Plaintiff offers no evidence that similarly situated employees were accused of similar conduct and were not suspended or terminated. In fact, Plaintiff offers no evidence that any employee who engaged in similar conduct was not suspended or terminated. Moreover, Plaintiff makes no argument that, assuming the factual basis for Defendant's actions were true and sufficient for discharge, Defendant's actions were more likely than not based on impermissible purposes. Instead, Plaintiff focuses on the first method of showing pretext by challenging whether Defendant had an honest belief in the underlying reasons for suspending and eventually discharging her. Plaintiff contends that Defendant could not have honestly believed that she violated her medical restrictions or that her medical condition improved based solely on the video of her bowling. In other words, Plaintiff attacks the sufficiency of Defendant's investigation as a means of discrediting its asserted justification for the adverse employment action.

"[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski*, 274 F.3d at 1117. To determine whether Defendant had an honest belief in the proffered reason for discharging Plaintiff, the Court must look "to whether [Defendant] can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). In this regard, the decisional process used by the employer need not be optimal or leave "no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). "Rather, the key

inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* Although the Court must not "blindly assume that an employer's description of its reasons is honest," the Court should "resist attempting to micro-manage the process used by employers in making their employment decisions." *Id.* "When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Id.* at 807-808.

The Sixth Circuit's opinion in *Smith v. Chrysler Corp.*, provides a clear example of the application of the honest belief rule. In *Smith*, the court of appeals concluded that the defendant reasonably relied on particularized facts in making its determination to discharge plaintiff on one ground, but did not reasonably rely on particularized facts on another, similar ground. *See Smith*, 155 F.3d at 808. The plaintiff in *Smith* was hired as an electrician at one of defendant's vehicle assembly plants. *Id.* at 802. Prior to applying for the job, the plaintiff had been experiencing episodes of sudden sleep. *Id.* After falling asleep while driving, the plaintiff began treating at a sleep disorder clinic where he was diagnosed as having a variant of narcolepsy. *Id.* Three years after visiting the clinic, the plaintiff applied for a job with the defendant and completed a medical history form in which he answered "no" to the question of "Have you ever had or have you now unusual tiredness or fatigue?" *Id.* According to the plaintiff, he answered negatively because his episodes were never caused by fatigue or tiredness but would occur without warning. *Id.* Later in the application process, the plaintiff allegedly informed one of the defendant's company doctors that he "might have a mild case of narcolepsy." *Id.* Finally, after a year of exemplary employment, the

plaintiff applied for a plant driver's license so that he could use the defendant's electric cars to travel from one end of the plant to the other in the event of a power outage. *Id.* The license would also permit the plaintiff to operate heavy machinery. *Id.* On the application for the license, the plaintiff answered "no" to the question "Have you ever had narcolepsy?" *Id.* at 803.

After being hired but prior to applying for the plant driver's license, the plaintiff's narcoleptic episodes resurfaced, requiring him to resume treatment at the sleep disorder clinic. *Id.* The physician's assistant that treated the plaintiff, who had been working the midnight shift, advised him to change his work hours to a normal daytime schedule in order to receive proper treatment for his condition. *Id.* In accordance with this advice, the physician's assistant wrote the defendant's doctor and requested that the plaintiff's shift be changed. *Id.* The plaintiff then visited the defendant's doctor who, based on the plaintiff's statements, noted that the plaintiff was narcoleptic but had failed to indicate this on his job application. *Id.* When the plaintiff's shift was not changed, several more letters were sent to the defendant's doctor; however, the plaintiff never received a shift-change. *Id.* Finally, a union representative informed the plaintiff's supervisor that the plaintiff was having difficulty staying awake while driving home at night. *Id.* The supervisor, who was unaware of the plaintiff's problems, pulled his employment records containing the plaintiff's answers on the medical history form and license application, as well as the correspondence between the doctors. *Id.* After reviewing the file, the supervisor asked the defendant's doctor if the plaintiff did in fact suffer from narcolepsy, to which the doctor answered affirmatively. *Id.* The supervisor then fired the plaintiff for lying on the medical history form and license application. *Id.* at 804.

In response to an allegation that the plaintiff was fired because of his narcoleptic-like disability, the defendant asserted that it actually discharged plaintiff for making false statements on

his medical history form and license application. *Id.* at 806. The plaintiff argued that if the defendant had conducted a more thorough investigation it would have learned that he did not suffer from narcolepsy and did not experience unusual fatigue. *Id.* The defendant countered that it honestly believed that the plaintiff suffered from narcolepsy, thus making his license application inaccurate, and had experienced unusual fatigue, rendering his medical history false. *Id.* The court agreed with the former assertion but not the latter, finding that the defendant reasonably relied on the particularized facts when it determined that the plaintiff falsely stated on his license application that he was not narcoleptic, but did not reasonably rely on the particularized facts when he claimed on his medical history to have not suffered from unusual fatigue. *Id.* at 808.

With respect to the determination that the plaintiff falsely stated he was not narcoleptic on the license application, the court found that the defendant had presented particularized facts supporting its conclusion. *Id.* Specifically, the defendant relied on its own doctor's notes and also the diagnoses of the plaintiff's treating doctors, which all referenced the plaintiff's narcoleptic-like disorder. *Id.* The court found that the defendant's reliance on the medical opinions of those with knowledge of narcolepsy and the plaintiff's symptoms was not unreasonable. *Id.* The court also rejected the plaintiff's argument that had the defendant conducted a more thorough investigation it would have discovered that he disclosed his narcoleptic symptoms during his initial medical evaluation prior to being hired. *Id.* at 806. The court reasoned that so long as the defendant's decision was reasonably informed and considered, it did not matter that the defendant's investigation was not "optimal or that it left no stone unturned." *Id.* at 807.

In contrast, the court found that the defendant did not present particularized facts supporting its conclusion that the plaintiff falsely stated that he did not suffer from unusual fatigue on his

medical history form. *Id.* at 808. Unlike the issue of whether the plaintiff suffered from narcolepsy, there were no facts supporting the defendant's belief that the plaintiff experienced unusual fatigue. *Id.* Instead, the court found that this conclusion was based on the supervisor's stereotypical assumption that all people with narcolepsy suffer from unusual fatigue. *Id.* As the court explained, fatigue, which is defined as weariness or exhaustion, is not the same as narcolepsy, which is characterized by sudden and uncontrollable lapses into a sleep-like state. *Id.* Since the supervisor had not investigated whether the plaintiff actually experienced unusual fatigue, the court reasoned that the defendant could not base its conclusion on particularized facts and thus, could not possess an honest belief that the plaintiff lied on his medical history form. *Id.* This point was moot, however, due to the defendant's honest belief that the plaintiff lied on his license application. *Id.* at 809.

As with the defendant's decision concerning the plaintiff's license application in *Smith*, the evidence in this case supports Defendant's claim that it reasonably relied on the particularized facts at hand when it determined that Plaintiff failed to provide information to her doctor that would have directly affected the conditions of her employment. As in *Smith*, Plaintiff's doctor stated that Plaintiff never told him that she bowled even though he examined her for purposes of re-evaluating her medical limitations shortly after she began bowling. Plaintiff's doctor also stated that bowling was an unwise activity for someone in Plaintiff's condition. Furthermore, once Plaintiff's doctor saw the video of her bowling with no apparent pain or discomfort, similar to *Smith*, he gave his medical opinion that Plaintiff no longer needed restrictions as to bending, stooping or twisting. Moreover, like the doctors at the sleep disorder clinic in *Smith*, Plaintiff's doctor had been treating her for over three years and was familiar with her condition. In addition, Plaintiff lied to the postal investigator when she stated that she had informed her doctor about bowling and that he approved of the activity.

Finally, after her suspension but prior to her discharge, Plaintiff admitted that she did not inform her doctor about bowling. *See Scott v. Firstmerit Corp.*, 167 Fed. Appx. 480 (6th Cir. 2006) (finding the defendant's reliance on the plaintiff's admission to conduct sufficient to support the defendant's honest belief). Based on these facts, Defendant could reasonably conclude that Plaintiff's failure to inform her doctor that she bowled directly affected the conditions of her employment in violation of Detroit District General Order #1–Dischargable Infractions, Item 4.

Plaintiff's evidence is insufficient to raise a genuine issue of material fact that Defendant did not reasonably rely on these facts when making its decision. Instead, like the plaintiff in *Smith*, Plaintiff attacks the sufficiency of Defendant's investigation and claims that Defendant could not have reasonably believed that her medical condition improved or that bowling was outside of her restrictions. However, Plaintiff's argument misses the point and fails to address the contention that she failed to tell her doctor that she bowled.[1] In order to show pretext, "the plaintiff must allege more than a dispute over the facts upon which [her] discharge is based." *Brathwaite*, 258 F.3d at 493-94. Rather, "[she] must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id.* at 494. As the court instructed in *Smith*, the relevant question is not whether Plaintiff's physical condition actually improved or whether bowling in fact was within her restrictions, but whether Defendant had a reasonable basis for believing that the fact she bowled would directly affect the conditions of her employment.

In the present case, Plaintiff offers no evidence that Defendant did not honestly believe that

---

[1]The Court notes that the arbitrator who reinstated Plaintiff following her grievance relied on this reasoning in making his decision. The Court rejects the arbitrator's decision for the same reasons it rejects Plaintiff's argument.

she misrepresented the state of her physical abilities. Unlike *Smith* where the defendant concluded the plaintiff lied when he stated he did not suffer from unusual fatigue based solely on stereotypical assumptions about narcolepsy, Defendant in this case did not jump to the conclusion that Plaintiff failed to disclose her abilities to her doctor based simply on rumors or the video of her bowling. Instead, Defendant sought the medical opinion of Plaintiff's treating doctor. In contrast to *Smith*, where the defendant's failure to gather particularized facts distinguishing fatigue from narcolepsy rendered its reliance on stereotypical assumptions about narcolepsy unreasonable, Defendant in the present case was justified in relying on the informed medical opinion of Plaintiff's treating physician.

Plaintiff counters that reliance on the doctor's opinion was unreasonable because he did not know the weight of the bowling ball. The Court finds this argument unpersuasive. Plaintiff's doctor had treated her condition for approximately three years and, as a result, was familiar with her condition. Although one of Plaintiff's restrictions was that she refrain from lifting more than 15 pounds, Plaintiff was also restricted from bending or stooping more than 15 minutes per day and completely restricted from twisting. Upon viewing the video of Plaintiff bowling it is apparent that Plaintiff engaged in bending, stooping and twisting with no discomfort or pain. Thus, whether the bowling ball weighed less than 15 pounds did not affect the doctor's determination that Plaintiff did not need limits on bending, stooping, or twisting. In fact, the doctor's revised restrictions are consistent with this interpretation: while the doctor completely lifted the restrictions on bending, twisting, and stooping, he maintained a weight restriction. Thus, Plaintiff's argument that Defendant was unreasonable in relying on the doctor's opinion is without merit.

Furthermore, the fact that Defendant could have ordered Plaintiff to undergo a performance

evaluation rather than interviewing her doctor does not render Defendant's reliance on the doctor's statements unreasonable. Defendant's investigation was not required to be optimal or leave no stone unturned. On the contrary, it is entirely reasonable during a fraud investigation to not tell the person suspected of fraud the reasons they are a suspect. If the opposite were true, the Court doubts that many fraud investigations would be successful at uncovering fraud. Finally, Plaintiff's reliance on her performance evaluations from 2005 that resulted in increased limitations is completely irrelevant as these facts did not exist at the time Defendant made its decision.

Additionally, as the court did in *Smith*, the Court rejects Plaintiff's implication that the fact she told some fellow employees that she bowled somehow renders Defendant's asserted reason for her discharge pretextual. Whether Plaintiff's co-workers knew she bowled does not change the fact that she did not tell her doctor during the evaluation that formed the basis of Plaintiff's relevant medical restrictions. Further, there is no evidence that anyone with decision making authority knew of Plaintiff's activity prior to the time Postmaster Taurence learned of it in early 2003.

Because Defendant has shown that it reasonably relied on particularized facts in determining that Plaintiff violated its work rule, Plaintiff cannot show that Defendant's nondiscriminatory reason for suspending and discharging her was a pretext for illegal discrimination. Accordingly, Defendant is entitled to summary judgment as to Plaintiff's disability discrimination claim.

## B.  Plaintiff's Retaliation Claim

Where the plaintiff seeks to prove her case based on circumstantial evidence, the same burden shifting framework applicable to Plaintiff's claim of disability discrimination is applicable to her claim of discriminatory retaliation. For convenience, the Court will not restate the steps of the burden shifting analysis under *McDonnell Douglas*.

The Court is inclined to agree with Defendant that Plaintiff has not presented sufficient evidence to show that the adverse employment action in this case was causally connected to her protected activity. However, the Court declines to decide this issue because even if Plaintiff has stated a prima facie case of retaliation, the retaliation claim fails for the same reasons as Plaintiff's discrimination claim. As discussed above, Defendant has articulated a legitimate non-discriminatory reason for her suspension and termination and Plaintiff has failed to come forward with sufficient evidence to show that Defendant's asserted reason was pretextual. Therefore, Defendant is entitled to summary judgment as to Plaintiff's retaliation claim.

## C. Plaintiff's Hostile Work Environment Claim

### 1. Factual Background for Plaintiff's Hostile Work Environment Claim

Plaintiff claims that since she returned to work following her surgery she began to experience a hostile work environment. Plaintiff asserts that numerous comments and events taking place between January 2000 and October 2006 form the basis for her hostile work environment claim.

In January 2000, shortly after she returned to work, Plaintiff was given a desk and chair in the back of the post office where she could perform her newly restricted duties, which included answering phones and sorting mail. (*See* Pl.'s Dep. at 34). However, Plaintiff felt that the desk was too short and the chair was uncomfortable. (*See id.* at 34-36). When she complained about the desk to her supervisor, Plaintiff received a different desk, which she also felt was too short. (*See id.*). In addition, Plaintiff took an ergonomic desk chair from another desk. (*See id.* at 37-39). When Plaintiff arrived at work the next day, the chair was not at her desk but had been returned to the desk where Plaintiff found it. (*See id.*). Upon asking her supervisor why the chair was removed, the supervisor told her that a co-worker needed the chair for his bad back. (*See id.*). Still, Plaintiff continued to

confiscate the chair for the next four or five days until the co-worker with the bad back was reassigned, at which time Plaintiff received full-time use of the chair. (*See id*.). Also in January 2000, Plaintiff's supervisor handed her a letter that the supervisor had written to a postal customer in response to compliments the customer had made about Plaintiff. (*See id.* at 112-15). Plaintiff, however, felt that she should have been awarded the letter in front of all of the other employees, as was the normal practice for presenting awards to postal employees. (*See id*.).

Because her work station was located in the back of the post office, Plaintiff could not hear when supervisors made announcements. (*See id.* 115-17). Normally, when an announcement was made, the supervisor would simply walk to the center of the work area, ask everyone to quiet down, and then make the announcement. (*See id*.). Under these circumstances, Plaintiff felt that she was being excluded from certain business, including safety talks that were given approximately every two weeks. (*See id*.). Despite, this feeling, Plaintiff never informed management that she could not hear announcements, nor did she ask a co-worker to inform her when an announcement was given. (*See id*.).

In connection to her physical restrictions, Plaintiff needed to stand and walk intermittently. Occasionally, Plaintiff would leave her desk and walk around the office. (*See id*. at 40). While doing so one day in the summer of 2001, Plaintiff's acting supervisor told her to return to her work area. (*See id*.). Plaintiff responded that she needed to walk because of her medical restrictions. (*See id*.). Following this exchange, Plaintiff continued to walk around the office frequently without incident. (*See id*.).

In the fall of 2001, another of Plaintiff's acting supervisors stated to Plaintiff: "I just want to know how you have the nerve to sit here and not do anything? Why didn't you just take the

retirement when they offered it to you." (*See id*. at 42-43). Plaintiff responded that she was not offered a retirement. (*See id*.). The next October, the same acting supervisor referred to Plaintiff as "useless" when another employee inquired as to why Plaintiff was never asked to work on holidays. (*See id*. at 46-49).

In late 2002 and early 2003, Plaintiff and a co-worker coordinated the Combined Federal Campaign (CFC), a fund rasing program for federal employees. (*See id*. at 52, 67-70). Part of their duties as coordinators required them to travel to the Southgate Post Office. (*See id*.). While there, Plaintiff requested work space in order to complete paper work. (*See id*.). The supervisor at Southgate provided Plaintiff with a spare room that Plaintiff described as a storage room, despite the apparent availability of other offices. (*See id*.). Although she was not happy with the accommodations, Plaintiff never asked why they could not use another office. (*See id*.). In May 2003, Plaintiff and the same co-worker were at the Southgate Post Office preparing to leave for the CFC banquet when a worker from Southgate stated to Plaintiff who was dressed casually: "Oh, so now you people get to wear your street clothes in here? What's up with that?" (*See id*. at 71-73). Plaintiff informed the worker that it was her day off and the conversation ended. (*See id*.).

During this same period of time, Plaintiff and the co-worker with whom she worked on the CFC were assigned the task of taking pictures for employee identifications. (*See id*. at 70-72). While taking the pictures at the Southgate Post Office, an employee stated to Plaintiff: "This must be nice. This is a really good job. How did you get this job?" (*See id*.). Plaintiff told the employee that she was on limited duty. (*See id*.). The employee replied, "Well I got bad knees. I just slap on a morphine patch and I just go on and do my job." (*See id*.). Plaintiff did not hear any comments from any other employee. (*See id*.).

At the end of January 2003, Plaintiff noticed a posting on the time clock at the Riverview Post Office. (*See id*. at 98-103). The posting contained several news headlines that involved Post Office business, one of which described a postal worker being convicted of worker's compensation fraud. (*See* Def.'s Ex. 40). Plaintiff felt this posting was offensive to disabled employees. (*See* Pl.'s Dep. at 98-103).

Between July and October 2006, Plaintiff experienced several incidents that she felt expressed hostility towards her because of her disability. One employee rolled her eyes when told she would have to break down mail into smaller bundles in order for Plaintiff to deliver it. (*See id*. at 82-83). Another employee twice filled a collection box with more mail than Plaintiff could lift under her restrictions; however, this behavior stopped when Plaintiff informed him of her lifting restrictions and asked him to be careful about how much mail he put in the box. (*See id*. at 84-85). When Plaintiff stated that she could not sort mail into boxes that were above her shoulder, another employee stated "Come on, you can do this, you can do this." (*See id*. at 86). On one occasion, Plaintiff's co-worker threw his pen on his desk when a supervisor told him that Plaintiff would be helping him with his route. (*See id*. at 87). Finally, Plaintiff asked another co-worker for help opening the rear sliding door on a postal vehicle. (*See id*. at 80-82). After the co-worker opened the door and returned to his duties, Plaintiff again asked him to open the door. (*See id*.). In response, the co-worker threw his arms in the air and opened the door for Plaintiff again. (*See id*.). Following this incident, Plaintiff took a brief period of medical leave based on stress. (*See* Def.'s Ex. 43-44).

Finally, Plaintiff was loading mail in her vehicle when a co-worker sent out a package that had not been pre-sorted into bundles within Plaintiff's lifting restriction. (*See* Pl.'s Dep. at 90-93). Plaintiff asked the employee if the package was under 10 pounds and the co-worker stated that it

weighed nine and a half pounds. (*See id*.). The co-worker also speculated that the packages Plaintiff had been lifting weighed more than 10 pounds. (*See id*.). Plaintiff did not know why the co-worker would make such a comment. (*See id*.).

### 2. *Analysis of Plaintiff's Hostile Work Environment Claim*

The elements of a hostile work environment claim based on disability are: (1) the plaintiff is disabled; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance; and (5) the employer knew or should have known of the harassment and failed to take corrective action. *Hafford v. Seidner*, 183 F.3d 506, 512-13 (6th Cir. 1999). In order to constitute actionable harassment, the conduct complained of must be judged by both and objective and a subjective standard. *Harris v. Forklift Sys., Inc.*, 510 U.S. 12, 21 (1993). That is, it must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard the environment as abusive. *Id.* at 21-22. The harassment must be sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *Valentine-Johnson v. Roche*, 386 F.3d 800, 814 (6th Cir. 2004).

In determining whether a work environment is actionably hostile, the Court looks at the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* The Court must recognize that Title VII is not a "general civility code" and provides a standard demanding enough to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language ... and occasional

teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)) (internal citations and quotations omitted). Accordingly, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82 (1998)) (internal citations and quotations omitted).

In support of her claim Plaintiff has presented several isolated incidents and argues that when viewed in light of Defendant's initiative to rid itself of disabled workers and the results of the workplace interviews these incidents establish a hostile work environment. Initially, the Court rejects Plaintiff's contention that Defendant's initiative and workplace interviews provide a backdrop for illegal discrimination. In the absence of this backdrop, Plaintiff is left with list of isolated comments or incidents, the majority of which do not support her claim that the hostility was based on her disability. Based on the record in this case, the Court concludes that Plaintiff's evidence of a hostile work environment fails to rise to the level of severity necessary to be actionable.

First, Plaintiff's contention that the NRI somehow evidences a general feeling of hostility towards disabled employees is not supported by the record. The initiative was intended to assess the status of disabled employees. *See* Def.'s Ex. 34 ¶ 6. Defendant's goal was to make sure that its workforce was being put to the most productive use. *See* Def.'s Ex. 35. Therefore, it sought to comprehensively review disabled employees work restrictions to "determine if they [were] currently in the appropriate position based on current medical information" and to "[i]dentify meaningful productive work in the Postal Service that [would] ensure that [Defendant] optimize[d] [its]

resources." *See* Def.'s Ex. 34 ¶6. If the employee was no longer disabled, his or her restrictions would be lifted. *See id.* ¶¶ 6-10. If the employee had a position that addressed his or her restrictions, no changes were made. *See id.* If an employee did not have a job that addressed his restrictions, he or she would either be assigned to a position that did or placed in a position outside the post office with worker's compensation accounting for any difference in pay. *See id.* Finally, if no position was available, the employee would have been entitled to full worker's compensation benefits. *See id.* Thus, nothing in NRI itself could be construed as exhibiting any hostility towards disabled employees because of their disability. Instead, the NRI was actually meant to place disabled employees in a position where they could be most productive.

In an effort to construe the NRI as a policy of discrimination, Plaintiff relies on hearsay statements made by co-workers. Following a meeting with management regarding the NRI, two union officials told Plaintiff that management was planning to direct disabled employees into jobs as airport security screeners or with McDonald's. (*See* Pl.'s Dep. at 43-46). Plaintiff also heard from another employee that Postmaster Taurence stated that when he transferred a disabled employee to a night shift, the employee's disability suddenly disappeared. (*See id.* at 94-98). Aside from being inadmissible for purpose of a motion for summary judgment, these statements do not change the character of the initiative from a program designed to place employees in a position to optimize their efficiency into one institutionalizing a discriminatory attitude towards disabled workers.

Similarly, Plaintiff's reliance on the results of the workplace interviews conducted in March 2003 is also misplaced. Similar to the statements about the NRI, the interview responses are not admissible for purposes of a motion for summary judgment. Additionally, even if the interview results were admissible, they do not support Plaintiff's claim of a hostile work environment. The

report contains comments from employees of the Wyandotte, Southgate and Riverview post offices. (*See* Pl.'s Ex. F). Yet during the relevant period Plaintiff primarily worked at the Riverview post office and she has not presented evidence that she was aware of any comments made at any post office other than Riverview prior to the date that the climate survey was released. More importantly, other than the few specific incidents recounted in her deposition, there is no evidence that Plaintiff was aware of any of the comments attributed to the Riverview post office. Virtually all of the comments that could be considered disability related were not made to Plaintiff personally. *See, e.g.*, *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir. 1997), *cert. denied*, 522 U.S. 865 (1997) (noting that most of the comments involved were not directed at plaintiff, a fact which contributed to the conclusion that the conduct was not severe enough to create an objectively hostile work environment). In the absence of any evidence that Plaintiff was aware of these comments, they constitute nothing more than private beliefs that, when unexpressed, do not form the basis of a claim for hostile work environment.

Without the NRI and the interview results, Plaintiff is left with a laundry list of comments and incidents, taking place over a period of nearly seven years, the majority of which do not support her claim that the hostility she experienced was based on her disability. Ordinarily, "[t]he harassment should be ongoing, rather than a set of isolated or sporadic incidents." *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999). The Court finds this evidence insufficient to support a claim of hostile work environment.

Plaintiff argues that the first example of a hostile work environment was the incident involving her work station and the dispute between herself and a co-worker over the ergonomic chair shortly after she returned from her surgery in January 2000. Plaintiff's medical restrictions, while

limiting her physical activity, did not mention the need for specific office equipment. Although Plaintiff claims that the work station was not comfortable, she has presented no evidence that other work stations were available but were denied to her. As a consequence, there is no evidence that Plaintiff was assigned an undesirable work station because of her disability. Additionally, as noted above, the co-worker involved in the dispute over the ergonomic chair, like Plaintiff, had a back problem; once the co-worker left Plaintiff's office, she received full-time use of the chair. Thus, this incident does not support an inference that Defendant deprived Plaintiff the use of the chair because of her disability.

Plaintiff next claims that she was treated differently from other co-workers, claiming that she was excluded from safety talks and did not receive recognition for awards. The record does not support Plaintiff's allegations that these incidents were related to her disability. With respect to the safety talks, Plaintiff testified that she could not hear when these talks were announced and that she did not ask anyone to notify her when the talks were going to happen. Further, Plaintiff has not shown that similarly situated non-disabled employees were given special notice when a safety talk was about to begin. Similarly, Plaintiff has not presented evidence that similarly situated employees were treated differently with respect to letters written in response to customer comments.[2] In fact, Plaintiff testified that she has received commendations in front of her fellow workers; earlier this year Postmaster Taurence presented Plaintiff with an award in front of the entire Riverview office for fifteen years of safe driving. (*See* Pl.'s Dep. at 112-15).Thus, there is no evidence that these

---

[2]The "commendation" involved in this incident was a letter Plaintiff's supervisor wrote to a postal customer in response to compliments the customer made about Plaintiff. (*See* Def.'s Ex. 39). There is no evidence suggesting that a letter, unlike Plaintiff's safe driving award, was the type of commendation that was normally presented in front of other employees.

incidents were related to Plaintiff's disability.

Plaintiff also argues that Defendant's posting on the time clock regarding a postal worker that was convicted of worker's compensation fraud is evidence of hostility to disabled workers. The Court disagrees. The posting Plaintiff complains of contains several headlines involving postal affairs, only one of which discusses worker's compensation fraud. Thus, the connection between this posting and any hostility towards disabled workers is tenuous at best.

In further support of her hostile work environment claim, Plaintiff testified regarding the three incidents at the Southgate post office that occurred in late 2002 and early 2003. Aside from the comment from the employee with bad knees, there is no evidence that these incidents were in any way related to Plaintiff's disability. In addition, the Court finds that the employee's comment is nothing more that simple teasing, which is not sufficient to form the basis of a hostile work environment claim. *See Faragher*, 524 U.S. at 788.

Plaintiff additionally points to five incidents that occurred between July and October 2004 and two incidents in 2006, which involved Plaintiff's co-workers rolling their eyes, expressing frustration with having to assist Plaintiff, or otherwise making comments concerning Plaintiff's medical restrictions. While these incidents were connected to Plaintiff's medical restrictions, they appear to be nothing more than the ordinary tribulations of the workplace, which do not constitute a hostile work environment. Furthermore, these behaviors stopped when Plaintiff informed the co-workers of her medical restrictions or asked for her co-workers to accommodate her needs. Significantly, these events were extremely infrequent and did not involve any physical threats or ridicule.

Finally, Plaintiff relies on the two comments made by one of her temporary supervisors.

Although these comments appear to be directly related to Plaintiff's disability, they are not sufficient to create an objectively hostile or abusive work environment, even when considered in combination with Plaintiff's other incidents. The comments were relatively isolated and, while harsh, were not of the extreme severity necessary to demonstrate a hostile work environment. *See Faragher*, 524 U.S. at 788. Also, Plaintiff has not shown that these comments unreasonably interfered with her work performance. *See Valentine-Johnson*, 386 F.3d at 814.

In sum, the complained of incidents amount to nothing more than "the ordinary tribulations of the workplace, such as the sporadic use of abusive language ... and occasional teasing." *Faragher*, 524 U.S. at 788. The offensive conduct was infrequent, consisted mostly of mere utterances, and involved no physical threats or ridicule. Thus, Plaintiff's evidence does not demonstrate the type of ongoing pattern of abusive conduct necessary to make a claim of hostile work environment. *Compare Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 351-52 (6th Cir. 2005) (holding that the first plaintiff failed to show a hostile work environment based on sexual harassment where the plaintiff's claims depicted isolated instances of mere utterances over a period of two and a half years rather than an ongoing situation); *Valentine-Johnson*, 386 F.3d at 814 (finding evidence insufficient to create hostile work environment based on sexual harassment where only one incident involved touching, sexual comments were infrequent and not physically threatening, and the defendant's behavior did not interfere with the plaintiff's work performance); *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2001) (holding that the employer's alleged request for sexual favors from the employee in exchange for a better evaluation, calling the employee "Hot Lips," making comments about the employee's state of dress, and telling dirty jokes in front of the employee did not create hostile work environment); *Plautz v. Potter*, 156 Fed. Appx. 812, 818-19

(6th Cir. 2005) (holding that employer's repeated comments to disabled employee concerning employee's excessive use of sick leave, employer's discipline of employee, employer's order for employee to recertify his medical condition, and employer's payroll mistake were insufficient to show hostile work environment based on disability where no evidence showed that the plaintiff was ridiculed or insulted because of his medical condition to the point that it permeated his work environment), *with Jordan v. City of Cleveland*, 464 F.3d 584, 590-93 (6th Cir. 2006) (finding ample evidence to support a claim of hostile work environment based on race where black firefighter was repeatedly subjected to frequent racial remarks, jokes and graffiti, repeatedly placed on shifts with all white firefighters, isolated in the fire hall, subjected to threats for complaining about racial hostility, repeatedly assigned demeaning chores, denied added responsibilities, forced to accept undesirable shifts, had his gear destroyed, and forced to apologize to white firefighters for complaining about racial harassment); *Clark*, 400 F.3d at 351-52 (finding second plaintiff's evidence sufficient to support claim of hostile work environment where she was repeatedly subjected to unwanted, sexually suggestive contact and sexually charged comments); *Fox v. General Motors Corp.*, 247 F.3d 169, 179 (4th Cir. 2001) (finding sufficient evidence of hostile work environment where plaintiff was harassed weekly, supervisors openly encouraged other employees to ostracize disabled workers and interfere with their ability to do their daily work by refusing to provide necessary assistance, and supervisors forced disabled employees to perform tasks outside of their restrictions). As a consequence, Plaintiff has failed to show that a reasonable person would find her work environment hostile or abusive. Therefore, Plaintiff cannot establish an essential element of her prima facie case and Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

## V.  CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Defendant's Motion for Summary judgment is GRANTED and Plaintiff's complaint is HEREBY DISMISSED.

IT IS SO ORDERED.


s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  July 19, 2007

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on July 19, 2007.


s/Marie E. Verlinde
Case Manager
(810) 984-3290